THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD MARTINEZ, Defendant-Appellant.

Third District   No. 79-527

Opinion filed May 14, 1980.

Drew Parker, of Peoria, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

This is an appeal by the defendant, Ronald Martinez, from his convictions for attempt murder, solicitation to murder and aggravated battery following a jury trial. The only issue raised in this appeal is whether there was sufficient evidence presented to find the defendant guilty beyond a reasonable doubt.

■ The basis of the defendant's convictions for attempt murder and aggravated battery was the defendant's legal accountability for the act of another. If, either before or during the commission of an offense, a defendant, with the intent to promote or facilitate the commission of that offense, solicits, aids, abets, argues or attempts to aid another person in the planning or commission of the offense, the defendant is legally accountable for the act of that other person. (Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).) To demonstrate a common purpose to perpetrate a crime, the evidence need not establish words of agreement, but the common purpose can be inferred from the circumstances surrounding the commission of the offense. *People v. Tate* (1976), 63 Ill. 2d 105, 345 N.E.2d 480; *People v. Minish* (1974), 19 Ill. App. 3d 603, 312 N.E.2d 49.

On review, a conviction will not be disturbed unless it clearly appears that there is insufficient credible evidence to establish guilt beyond a reasonable doubt, but if the evidence, though conflicting, would be sufficient in the event the prosecution's witnesses are believed, the question is for the trier of fact. *People v. Carpenter* (1963), 28 Ill. 2d 116, 190 N.E.2d 738.

"The jury may always believe as much or as little as they please of a witness' testimony. [Citation.] The jury's province is to sort out conflicting evidence, determine credibility and weigh testimony,

and the verdict will not be disturbed unless so unsatisfactory as to leave a reasonable doubt as to the accused's guilt." *People v. Fleming* (1976), 42 Ill. App. 3d 1, 4, 355 N.E.2d 345, 348.

In the case at bar, the jury was presented with evidence that two women were instructed by the defendant to bring the victim, Daniel Pratt, to a garage where the defendant and his friends worked on their cars. Pratt, the two girls, and Daniel Carson, a friend of Pratt, were riding in Pratt's car all that afternoon before the incident, sharing two bottles of wine.

As to the events that occurred after the girls delivered Pratt to the garage, the testimonies of Pratt, Carson, and Timothy Tate, a security guard at the garage, were essentially identical. One of the girls went inside the garage to inform the defendant of their presence while the other girl delayed getting out of the back seat of Pratt's car until the defendant and his friends came out of the garage. One of the defendant's friends walked over to Pratt's car, opened his car door, and told Pratt that the defendant wanted to see him. The defendant confronted Pratt, who testified to never having personally met the defendant before, about some alleged statements Pratt made about the defendant and attempted to coax Pratt into taking some action. Pratt responded by conversation which was described by Tate as being "normal" and nonthreatening to the defendant. At that point the defendant told his friend to go inside the garage and get a shotgun. According to the defendant, there was no shotgun in the garage and this was done only to frighten Pratt.

Pratt then left the scene by driving down an alley. Neither he nor Carson was familiar with the area or the streets and arrived at what appeared to be a dead end. There was testimony that there were two possible exits. However, the police officer who testified about the possible exits specifically stated he was not sure if any of the exits were blocked by snow on that particular date. Tate was the only person who testified that he checked the alley on the date in question, and found that an exit was snowbound. Pratt thus turned his car around and headed back towards the garage because it seemed to him to be the only exit available.

Upon his return trip past the garage, Pratt noticed that the defendant was the only person who seemed to be still around. Pratt decided to attempt to discover why the defendant was angry at him since he did not want to be constantly looking over his shoulder in fear of the defendant. Pratt parked some distance away. He was not fearful of any shotgun at that time because the only person in sight was the defendant, who was holding a tire iron. As Pratt was getting out of his car to talk to the defendant, Carson said there was someone pointing a gun at them. As Pratt was getting back into the car, he heard the defendant state to Steve Filker, who was holding the rifle, either "shoot him" or "go ahead and

shoot him." Carson testified that Filker yelled to the defendant, asking him if it was okay to shoot Pratt, to which the defendant stated: "Shoot him." Tate testified to having heard the same conversation. Filker shot through the car's front windshield and struck Pratt in the head. Pratt further testified while he was attempting to leave after being shot, the defendant was smiling and stated something to the effect that "if you want war, you have war."

The defendant, codefendant Filker, and their witnesses testified that Pratt had a gun and pointed it at the defendant when Pratt was first brought to the garage. However, the defendants and their witnesses are, admittedly, all friends. In addition, the gun allegedly carried by Pratt was described differently by various witnesses and none, except Steve Filker, testified to seeing the shooting.

Pratt stated that he had no gun. Carson did not see a gun in Pratt's hand, and Timothy Tate did not at any time see a pistol in the possession of Pratt even though he had a fairly clear view of him the first time Pratt was at the garage. Tate clearly saw both of Pratt's hands on the steering wheel with no gun in hand when Pratt later returned. Furthermore, Pratt's alleged gun was not seen or found after Pratt was shot. None of the witnesses saw any gun being thrown out of Pratt's car window as it left towards a cafe approximately 50 yards away. No one at the cafe observed a gun. No gun or evidence of a gun was found in Pratt's car or on the persons of Pratt or Carson when the police arrived at the cafe, and no gun was found at the garage.

On the other hand, Douglas Cathcart testified that he had seen Pratt place a gun in the glove compartment of his car on a prior occasion. However, it was brought out during cross-examination that Cathcart was angry at Pratt for having been involved with Cathcart's wife and breaking up his marriage. Concerning the gun, Cathcart stated that he saw Pratt placed the alleged gun in the glove compartment while he, Cathcart, was sitting in the back seat of another car six to eight fee away. He admitted, "I didn't really get that good a look on it [the gun]. * * * Somebody told me he had a gun and I took it from there." Cathcart further admitted he was a friend of defendant Martinez.

Except for Timothy Tate, all the incident witnesses are closely associated with either the victim or the defendant. Tate was a security guard who spent time in the company of the defendants and their friends and considered himself on a friendly basis with the defendants. He did not even know Pratt or Carson. Tate did not cooperate with the police when initially questioned by them after the shooting. But after conferring with his employer the next morning, he realized how much he stood to lose by not telling the truth. He had a police commission as a security guard and did not want to lose it. Tate also testified that he came forward

to testify against the people he knew because that is what the law requires and he wanted to be a good citizen.

■■ Based on this evidence, any portion of which the jury could believe or disregard, the jury could properly find the defendant guilty of the offenses charged beyond a reasonable doubt. Accordingly, the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

ALLOY, P. J., and SCOTT, J., concur.